Dowling, J.
We have for review a judgment dismissing the
plaintiff’s complaint upon the merits. The subject of the action is a house and lot on Wegman Eoad, Town of Gates, Monroe County, New York." The following are the underlying facts. The parties to the action are veterans of the Spanish American War and World War I. Both were members of L. Boardman Smith Camp of the United Spanish American War Veterans, hereafter referred to as the Camp. When they joined the Camp in 1931 each took the following oath: “I will aid, so far as I can without injury to myself or family, worthy comrades, their dependents, and the dependents of those deceased, who need my assistance, and in the spirit of true comradeship seek to promote their welfare. This obligation I voluntarily assume and promise to fulfill.” In 1933 the defendant voluntarily assumed to act without compensation, as service officer for the Camp. As such volunteer he assisted such members of the Camp who might have claims to present for compensation benefits and who might apply for admission to veterans hospitals for medical treatment.
By title II of chapter 867 of the United States Statutes at Large, (Vol. 49) Public No. 844, effective June 29, 1936 (U. S. Code, tit. 38, § 101), the Congress authorized the Administrator of Veterans Affairs to recognize representatives of the United Spanish War Veterans in the presentation of claims under *225 statutes administered by the Veterans Administration. No such representative would be recognized until a certificate had been filed with the Veterans Administration. By chapter 480 of the Laws of 1938, section 12 of chapter 16 of the Laws of 1909, was amended by adding thereto subdivision 59 (County Law, § 12, subd. 59, now subd. 59-a as amd.) which empowered boards of supervisors of counties to employ a person to be known as a county service officer whose duty it shall be to assist any person residing in a given county who had served in the military service of the United States and who had been honorably discharged from such service in obtaining from the State or Federal Government any award or awards, benefit or benefits, to which he was or might become entitled under existing or future Federal or State legislation. The United Spanish War Veterans of Monroe County designated the defendant as their service officer and the Board of Supervisors of Monroe County appointed him to the position of County Service Officer and fixed his compensation. The defendant qualified and held that position until October 18, 1944, when he resigned to accept a position with the Veterans Administration in Washington.
In 1933 the plaintiff purchased for $2,000 the above-mentioned property. The construction of the dwelling on the property had not been completed when the plaintiff acquired title. To enable him to complete the dwelling, the plaintiff borrowed from Profit Savings and Loan Association of Rochester, N. Y., the sum of $700 and to secure the payment thereof the plaintiff executed to the Loan Association a mortgage on said premises in the amount of the loan which mortgage was payable in monthly installments. In 1940, such association became the First Federal Savings and Loan Association of Rochester, New York, hereafter referred to as First Federal, and the plaintiff continued to make his monthly payments to that institution. Late in 1941 or early in 1942, the plaintiff claimed that First Federal had not given him credit for all the payments he had made on his mortgage and he discontinued making his monthly payments. In February, 1942, First. Federal instituted a foreclosure action on its mortgage and served a copy of the summons and complaint on the plaintiff on February 5, 1942. The plaintiff disregarded the service on the erroneous assumption that First Federal could not foreclose its mortgage because the plaintiff had purchased the mortgaged premises with pension moneys which he had received from the Federal Government. He defaulted in the foreclosure action. On August 17, 1942, First Federal entered judgment of foreclosure by default. A referee was appointed to sell the property. *226 The referee duly advertised the proprty for sale and on October 15,1942, he sold the property at public sale to First Federal for $450 leaving a deficiency of $230.70. The referee executed a deed to First Federal on October 21, 1942. The plaintiff, however, remained in possession of the property. The defendant purchased the property from First Federal and paid therefor the sum of $703.83. Defendant received his deed on January 8, 1943, and recorded it in Monroe County Clerk’s Office on that date. Before purchasing the property for himself the defendant did not inform the plaintiff or the Camp that the property had béen sold or that he intended to purchase it. The plaintiff remained in possession of the property. On May 17, 1945, defendant served a written notice on the plaintiff to.quit and surrender possession of the property. The fact that the defendant had acquired the title to the plaintiff’s property first came to the attention of the Camp in the fall of 1944 at a meeting at which the defendant was present. At that time the defendant said he would convey the property to any of the officers of the Camp there present for what he had paid for it. The officers declined his offer as they did not desire to hold the property personally. The Camp appointed a committee to inquire into the matter. In December 1944, at a meeting of the Camp which the defendant attended, the committee made its report. The defendant then stated that the property was his and that that was final as far as he was concerned. On May 16, 1945, the Camp adopted a resolution offering to reimburse the defendant for the amount he had invested in the property or for such amount.as his attorney and the Camp’s attorney could agree upon. The substance of that resolution was communicated to the defendant on June 25, 1945. The offer was not accepted. On August 25,1945, the Camp’s attorney called upon the defendant and offered him on behalf of the plaintiff complete reimbursement and interest at 6% for the moneys that he had expended in taking over the property. The defendant said “ If you want to give me four thousand dollars, I will take it.” This action followed.
It appeared upon the trial that for many years the plaintiff had suffered from a serious malady which necessitated his hospitalization in veterans hospitals on thirty different occasions and that he was in a disturbed mental condition and that he had been confined to his house or a hospital' for about four years. It also appeared that the defendant had assisted him in gaining admission to veterans hospitals on different occasions. The-plaintiff testified that he had consulted the defendant about the *227 payments he had made on the mortgage to First Federal, had given him his deposit hooks and that the defendant had promised to inquire into the matter for him. The plaintiff also testified that he had given the papers in the foreclosure action to the defendant and that the defendant had told him not to worry, that he would look after the matter for him. The plaintiff also testified that he had appointed the defendant to represent him before the Veterans Administration. The plaintiff also testified that the defendant had never informed him that the property had been sold or that he had acquired title thereto until the spring of 1945. There was also proof that the Camp first learned that the defendant had acquired title to the plaintiff’s property in the fall of 1944 and that the Camp had offered to compensate the defendant in behalf of the plaintiff for the moneys he had expended in acquiring the title and for the taxes he had paid and that the defendant had rejected the offer and had demanded $4,000 for a conveyance. There was also evidence that the property was worth $3,800 in October 1942 and $4,600 at the time of the trial. The plaintiff also testified that he first learned his property had been sold to the defendant when he went to pay his taxes in January, 1944, and that defendant had never demanded possession of the property until the spring of 1945. Mr. Allen, the attorney for First Federal, testified that the defendant had consulted him before the property had been sold in the foreclosure action saying “ that Lloyd had come to him in regard to his affairs involved in the foreclosure action.” Mr. Allen further testified “ The Court: In any conversation did Mr. Phillips state to you that he was buying this property for Mr. Lloyd? A. I would have no recollection of his saying that in so many words.”
The defendant testified that the plaintiff had given him no papers at any time relating to his property and that he had never discussed the subject with the plaintiff and had never promised him that he would look after the matter for him. The defendant also testified that he first talked to Mr. Allen about the foreclosure action on October 23, 1942, after the property had been sold. Defendant did not explain what induced bim to contact Mr. Allen . Defendant also testified that he called on the defendant’s adopted son on October 23,1942, and tried to interest him and his wife in procuring a deed of the property from First Federal; that First Federal would sell the property, for what it had cost it, about seven hundred dollars; that he offered to loan them the money and take their note; that they refused the proposition saying they were not on good terms with the plaintiff *228 and that they were already obligated for all they could assume. The defendant did not explain why he did not contact the plaintiff or the Camp on the matter. He and the plaintiff had been close friends and comrades for twenty years or more and he had been commander of the Camp and was in good standing in that organization. After the adopted son and his wife had declined to purchase the property, the defendant testified that he again contacted Mr. Allen and inquired what First Federal would sell' the property to him for and he was informed that it would sell the property for the amount it had cost on the foreclosure sale; that he told Mr. Allen he was going on a vacation and he would take the matter up with him upon his return; that on December 3.1942, he notified First Federal he would purchase the property and to send the search and papers to his attorney; that his attorney examined the title and that the matter was closed on January 8.1943. That he paid to First Federal for the property $703.83.
The learned trial court found that the defendant did not represent to anyone that he was purchasing the property for and in behalf of the plaintiff; that no fraud was perpetrated or practiced upon the plaintiff by the defendant; that the defendant purchased the property in his own name and with his own funds and is the owner in fee thereof and is entitled to the immediate possession of the property. The court was not asked to find and did not find that the defendant had not promised and agreed to protect the plaintiff’s interests in the foreclosure action. We think these findings are against the weight of the evidence. Mr.Allen was a disinterested witness. Sufficient weight was not given to his evidence. He testified that the defendant had contacted him before the foreclosure sale saying he was representing the plaintiff. It could also be reasonably inferred from Mr. Allen’s testimony, that the defendant said that he was purchasing the property for the plaintiff. Under such circumstances it could not be said as a matter of law that the plaintiff was not damaged by the defendant’s acts in acquiring title to the property for himself. Upon the whole evidence it is reasonably clear that a relation of trust and confidence existed between the plaintiff and the defendant at all the times mentioned in the evidence and a court might reasonably find that the defendant violated such trust and confidence when he acquired the title to the plaintiff’s property in his own name. Such a finding would amount to at least a fraud in law upon the plaintiff. No finding was proposed or made upon the subject of trust and confidence. “ A court of equity finding an abuse of confidence, might give *229 relief upon the ground of fraud ”. (Melenky v. Melen, 232 N. Y. 19, 22.) The courts will not permit the Statute oí: Frauds to he used as an instrument of fraud. (Wood v. Rabe, 96 N. Y. 414, 424.) Courts will declare a grantee a trustee ex maleficio to prevent fraud. (Ahrens v. Jones 169 N. Y. 555, 560-561.) “ A constructive trust is the formula through which the conscience of equity finds expression ”. (Beatty v. Guggenheim Exploration Co. 225 N. Y. 380, 386.) “ A constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. * * * An express trust arises because the parties intended to create it. A constructive trust is not based upon the intention of the parties but is imposed in order to prevent one of them from being unjustly enriched at the expense of another.” (3 Scott on Trusts, § 462.1.) “Multifarious are the circumstances which may call for the imposition of a constructive trust.” (Equity Corp. v. Groves, 294 N. Y. 8, 13.) The record fails to disclose fully the practices of the Camp in coming to the aid of distressed comrades and as to whether the Camp was in a financial condition to aid the plaintiff in retrieving his property prior to May 1945.
The judgment appealed from is against the weight of the evidence. The judgment should be reversed on the facts and a new trial should be granted, with costs to the appellant to abide the event.
All concur, Habéis, J., in result only. Present — Taylor, P. J., Dowlihg, Habéis, Mg Cues' and Larkih, JJ.
Judgment reversed on the facts and a new trial granted, with costs to the appellant to abide the event.